

**SEALED**



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

DEC 18 2019

CLERK U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. SA19CR0905 DAE |
| Plaintiff, | **INDICTMENT** |
| v. | **Count 1**: 18 U.S.C. § 371: Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks |
| CHRISTOPHER FELIX MONTOYA, (1), and NANCY ALMAGUER, (2) | |
| Defendants. | **Counts 2-4**: 42 U.S.C. § 1320a-7b (b)(1): Soliciting and Receiving Illegal Health Care Kickbacks. |

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Defendants and Related Entities

1. Defendant Christopher Felix MONTOYA was a resident of San Antonio, Texas, and a licensed physician's assistant. MONTOYA was the registered owner and operator of two medical offices, both named TPC Family Medicine and Urgent Care ("TPC clinics"). One of the TPC clinics was located in San Antonio, Texas, with the other in Laredo, Texas. The TPC clinics were registered providers with Medicare and Medicaid.

2. Defendant Nancy ALMAGUER, was a resident of San Antonio, Texas, and an employee at the TPC clinics. As of May 25, 2018, ALMAGUER was listed as the Chief Operating Officer of the TPC clinics.

## The Medicare Program

3. The Medicare Program ("Medicare") was a federally funded and administered healthcare program providing benefits to individuals who were sixty-five (65) years of age or older, or disabled. The program was administered through the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Medicare was paid for primarily through federal income and payroll taxes. This program is referred to collectively herein as "Medicare". Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

4. Medicare was subdivided into multiple Parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care. Parts A and B were known as the "original fee-for-service" Medicare program, in which Medicare paid health care providers fees for services rendered to beneficiaries.

5. Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a unique Medicare identification number that was used to process bills linked to that beneficiary.

6. Medicare paid for reasonable and necessary medical services provided to individuals and families who are deemed eligible. Medical service providers were required to be registered with Medicare in order to receive reimbursements. Healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." Service providers enrolled with Medicare received a unique provider number with which to identify themselves when submitting Medicare claims.

7. To participate in Medicare, providers were required to submit an application in which they agreed to comply with all Medicare-related laws and regulations. Per the provider

agreement with Medicare, providers had a duty to become educated with and knowledgeable of the contents and procedures of the Medicare program. Providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

8. The Federal Anti-Kickback Statute was a law prohibiting service providers from paying or receiving remuneration of any kind in return for inducing the referral of a patient or service being paid for by Medicare funds. To receive Medicare funds, enrolled providers agreed to, and were required to abide by, the Anti-Kickback Statute and other laws and regulations.

9. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company. When submitting, or causing claims to be submitted, under the provider's unique personal identification number, a provider was certifying that the services were properly rendered and were medically necessary. Medicare paid claims submitted by providers through automatic deposits and by checks issued to the provider.

10. A Medicare claim for reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the service provided to the beneficiary, the date the service was provided, the cost of the service, and the name and unique provider identification number of the physician or health service provider who prescribed or ordered the service.

11. MONTOYA was an enrolled Medicare provider. TPC and MONTOYA collectively operated under three separate National Provider Index numbers, with MONTOYA being listed as the authorized official for each of these numbers.

## COUNT ONE
### Conspiracy to Defraud the United States and to
### Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

12. Paragraphs One through Eleven of this Indictment are realleged and incorporated by reference as though fully set forth herein.

13. From in or about September of 2018, through in or about June of 2019, in the Western District of Texas, and elsewhere, the Defendants,

**CHRISTOPHER FELIX MONTOYA, (1),
and NANCY ALMAGUER, (2),**

did knowingly and willfully combine, conspire, confederate and agree together and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States and in its administration and oversight of Medicare;

b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals and services for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing

Indictment – Page 4

and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

14. It was a purpose of the conspiracy for defendants MONTOYA and ALMAGUER along with others known and unknown to the Grand Jury, to unlawfully enrich themselves and others by paying and receiving kickbacks and bribes in exchange for sending patient nasal swabs to a specific laboratory for testing, at least some of which was billed to the Medicare program.

## Manner and Means of the Conspiracy

15. The manner and means by which MONTOYA, ALMAGUER, and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

16. MONTOYA and ALMAGUER operated the TPC clinics to achieve the objective of the scheme to defraud: to unlawfully enrich themselves and their co-conspirators by agreeing to perform nasal swab procedures on patients, and sending those swabs for testing to a specific San Antonio area laboratory (the "Lab") in exchange for kickbacks and bribes on claims submitted to federal health care benefit programs.

17. Beginning in or about September 2018, an individual cooperating with the Federal Bureau of Investigation (the "CW") informed MONTOYA and ALMAGUER that he/she was able to receive illegal kickback payments through the Lab. The CW stated to MONTOYA and ALMAGUER that the Lab was able to be reimbursed by Medicare for performing virus screenings on nasal swabs from patients, and that the CW would be paid on a per test basis for every swab directed to the Lab. The CW offered to pay MONTOYA and ALMAGUER part of the kickback

he/she received, if MONTOYA and ALMAGUER agreed to swab patients at the TPC clinics and send the swabs to the Lab for testing.

18. MONTOYA and ALMAGUER agreed to this arrangement and thereafter began directing employees at the TPC clinics to perform the requested nasal swabs. Once the swabs were performed, they would be sent to the Lab. The Lab would perform the testing, receive reimbursement from Medicare and other insurance programs, and then pay the CW. The CW would then in turn pay MONTOYA and ALMAGUER.

19. To conceal the illegal kickbacks and bribes, MONTOYA, ALMAGUER, and the CW arranged for the payments to be made entirely in cash, and did not enter into any formal employment or business contracts with the CW.

20. During consensually recorded telephone calls, text messages, and in-person meetings, MONTOYA, ALMAGUER, and the CW discussed the manner in which they would conduct this scheme including; different possibilities for how to disguise the payments from the CW to MONTOYA and ALMAGUER, directing TPC employees to perform as many swabs as possible, the exact percentage of the CW's kickback that MONTOYA and ALMAGUER would receive, and the method by which the co-conspirators would keep track of how many swabs MONTOYA and ALMAGUER should be paid for.

21. From in or about September of 2018, to in or about June of 2019, MONTOYA and ALMAGUER did in fact send nasal swabs from the TPC Clinics to the Lab for testing, ultimately resulting in public and private insurance billing in the amount of approximately Eighty-Thousand ($80,000) Dollars. Of this total, approximately Forty-Seven Thousand ($47,000) Dollars were billed to Medicare.

## Overt Acts

22. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Western District of Texas, and elsewhere, the following overt acts:

    a. In or around September of 2018, MONTOYA, ALMAGUER, and the CW met at the TPC Clinic in San Antonio, Texas, and agreed to engage in the kickback conspiracy.

    b. From in or around October of 2018, to in or around June of 2019, MONTOYA and ALMAGUER performed, and directed to be performed, nasal swabs of TPC clinic patients and sent the swabs to the Lab for testing.

    c. From in or around October of 2018, to in or around June of 2019, MONTOYA and ALMAGUER kept and reviewed records of which patients had been swabbed, and whether their testing had been performed, for the purpose of determining the amount of kickback that they should be paid.

    d. In or around December of 2018, MONTOYA and ALMAGUER met with the CW in San Antonio, Texas, and were paid a kickback payment of approximately $1,178.

    e. In or around January of 2019, ALMAGUER met with the CW in San Antonio, Texas, and was paid a kickback payment of approximately $2,038.

    f. In or around February of 2019, MONTOYA met with the CW in San Antonio, Texas, and was paid a kickback payment of approximately $1,918.

    g. In or around March of 2019, ALMAGUER met with the CW in San Antonio, Texas, and was paid a kickback payment of approximately $2,614.

h.   In or around April of 2019, MONTOYA met with the CW in San Antonio, Texas, and was paid a kickback payment of approximately $1,234.

i.   In or around June of 2019, MONTOYA met with the CW in San Antonio, Texas, and was paid a kickback payment of approximately $316.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO – FOUR
### Soliciting and Receiving Illegal Health Care Kickbacks.
### (42 U.S.C. § 1320a-7b(b)(1))

23.   Paragraphs One through Twenty-Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

24.   From in or around October of 2018, to in or around June of 2019, in the Western District of Texas, the Defendants,

**CHRISTOPHER FELIX MONTOYA, (1),
and NANCY ALMAGUER, (2),**

knowingly and willfully, solicited and received any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, from the CW in return for referring patient nasal swab testing to the Lab for which payment would be made in whole or in part by the Federal health care program Medicare, including, but not limited to, the following dates and amounts:

| Count | Date | Amount |
|---|---|---|
| 2 | 12/10/18 | $1,178.60 |
| 3 | 1/23/19 | $2,038.54 |
| 4 | 2/11/19 | $1,918.25 |

All in violation of Title 42, United States Code Section 1320a-7b(b)(1).

Indictment – Page 8

## Notice of United States of America's Demand for Forfeiture
[*See* Fed. R. Crim. P. 32.2]

### I.
### Health Care Fraud Violations and Forfeiture Statute
[Title 18 U.S.C. 371 and Title 42 U.S.C. § 1320a-7b(b)(1), subject to forfeiture pursuant to Title 18 U.S.C. 982(a)(7)]

This Notice of Demand for Forfeiture includes but is not limited to the property described below.

25. As a result of the foregoing criminal violations set forth in Counts One to Four, the United States of America gives notice to Defendants Christopher Felix MONTOYA and Nancy ALMAGUER of its intent to seek the forfeiture of any forfeitable property upon conviction and as part of sentencing pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 982(a)(7), which states:

> (a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### II.
### Money Judgment

**Money Judgment**: An amount of money which represents the proceeds obtained directly or indirectly as a result of the violations set forth above for which Defendant is liable.

### III.
### Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of the Defendant:

    a.    cannot be located upon the exercise of due diligence;
    b.    has been transferred or sold to, or deposited with, a third party;
    c.    has been placed beyond the jurisdiction of the court;
    d.    has been substantially diminished in value; or
    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property of the Defendant, up to the value of said money judgment, as substitute assets pursuant to Title 21 U.S.C. 853(p) and Fed. R. Crim. P. 32.2(e)(1).

By:

John F. Bash
United States Attorney

JUSTIN CHUNG
Assistant United States Attorney
U.S. Attorney's Office, WDTX
601 NW Loop 410, Suite 600
San Antonio, Texas 78216

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

Indictment – Page 10